UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

SCOTTY McCOLLUM )
)
           PLAINTIFF )
)
v. ) CIVIL ACTION NO. 5:11CV177 DPJ-FKB
)
JACOBS ENGINEERING GROUP, INC. )
)
           DEFENDANT )

## COMPLAINT

### (JURY TRIAL DEMANDED)

Comes now the Plaintiff, Scotty McCollum ("McCollum"), and for his Complaint and causes of action against the Defendant, Jacobs Engineering Group, Inc. ("Jacobs"), states and alleges as follows:

### *I. Parties and Jurisdiction*

1. McCollum is a citizen and resident of Vicksburg, Warren County, Mississippi.

2. Jacobs is a corporation organized and existing pursuant to the laws of the State of Delaware. Jacobs' headquarters and principal address is located in Pasadena, Los Angeles County, California.

3. Jacobs is one of the world's largest and most diverse providers of engineering and construction consulting services, employing over 55,000 persons worldwide, with annual revenues of $10 billion.

4. Jacobs transacts business, and is registered to do business, throughout the United States. More specifically, Jacobs does substantial business in the State of Mississippi, including its office and operations located at or near the Stennis Space Center in Hancock County, Mississippi.

5. McCollum's complaint sets forth causes of action for retaliatory discharge in violation of the False Claims Act, codified at 31 U.S.C. §3730(h); as well as pendent claims predicated on applicable state law for wrongful discharge.

6. This Court has jurisdiction over the parties and subject matter of this action. More specifically, Federal Question jurisdiction is invoked pursuant to 28 U.S.C. §1331. Supplemental jurisdiction is invoked pursuant to 28 U.S.C. §1367.

7. Venue is appropriate in the United States District Court for the Southern District of Mississippi pursuant to 31 U.S.C. §3132(a), because Jacobs maintains offices and transacts substantial business in the Southern District of Mississippi. McCollum is a citizen and resident of this District as well.

## *II. Factual Background*

8. McCollum has significant qualifications and employment experience in the field of commercial and industrial construction contract administration in both the private and public sectors. McCollum's qualifications include extensive continuing education and experience with the Federal Acquisition Regulations, see Title 48 of the Code of Federal Regulations (hereafter the "FAR"). The FAR is the primary regulation applicable to federal executive agencies and departments for the acquisition of supplies and services procured with U.S. Government funds. The FAR is promulgated under the joint authorities of the Administrator of General Services, the Secretary of Defense, and

the Administrator for the National Aeronautics and Space Administration, as well as pursuant to broad policy guidelines of the Administrator, Office of Federal Procurement Policy, and the Office of Management and Budget. Among other things, the FAR sets forth mandatory regulations for the method and manner in which government funds are used to construct federal facilities through third-party contractors.

9. On or about July 2008, the United States Federal Bureau of Prisons ("FBOP") awarded Caddell Construction Company and W.G. Yates Construction Company (technically a joint venture referred to herein as "CaddellYates") a $185 million "design-build" contract for the construction of a women's correctional facility in Aliceville, Alabama (hereafter the "Aliceville Prison Project," or at times simply the "Project"). The Project was scheduled for completion by the end of 2011.

10. The scope, terms, and details of federal "design-build" construction contracts are typically set out in a document known as the Request for Proposal ("RFP"). In this case, which involved a "design-build" contract, the RFP for the Aliceville Prison Project, along with concept drawings, construction drawings, and other contract documents with CaddellYates, are collectively referred to hereafter as the "Construction Documents."

11. On or about the same time as CaddellYates was awarded its construction contract, Jacobs was awarded a separate contract to provide construction management services for the Aliceville Prison Project. In this case Jacobs contracted with the FBOP to provide services which included review of construction documents, administrative support services, construction project scheduling services, inspection, monitoring of testing, and other "checks and balances" type services related to implementation of the design-build contract with CaddellYates.

12. On or about October 29, 2008, McCollum was offered employment as part of Jacobs permanent staff. McCollum was assigned to work as a resident field engineer at Jacobs' Aliceville, Alabama office. Pertinent employment documents are attached hereto as Exhibit "1" and incorporated by reference.

13. McCollum's employment was at an annual salary of $90,000.00, plus $14,400.00 per year in taxable per diem compensation, plus insurance and other employment benefits.

14. As a condition to his employment, Jacobs required McCollum's written agreement to comply with Jacobs' Corporate Policy on Business Conduct, Integrity, and Ethics. A copy of said contract is attached hereto as Exhibit "2" and incorporated by reference.

15. One of Jacobs' construction management responsibilities was to analyze construction change orders, also known as a Modification Proposal Request ("MPR"). An MPR is the method by which changes (in terms of scope, details, and price) are made to a federal construction contract. The FAR requires MPRs to be assessed through a system of checks and balances, including one process known as the Independent Government Estimate ("IGE"). The IGE is the independently determined cost or price for a particular change order. The IGE is predicated on detailed analysis and documentation as to what the fair and competitive price should be.

16. The IGE process is frequently performed by a third party for the purpose of *independently* verifying the technical necessity, details, and scope of individual construction items to be changed. The IGE process culminates with an independently derived price, which can then be used to verify that the contractor's price for the change order is valid and competitive. The process of establishing the IGE requires a skilled analysis and side by side comparison of the MPR against the original or then existing Construction Documents. However, in order for the IGE

analysis and price to be valid, it is imperative that the independent analyst *not* be privy to the contractor's proposed price during the course of the IGE analysis. In this case, the FBOP was required to obtain an "approved" or "certified" IGE analysis from Jacobs prior to FBOP's acceptance of MPRs submitted by CaddellYates. Jacobs approval/certification of an IGE was a prerequisite to the FBOP accepting/approving the MPR. An "approved" MPR is in turn used by the FBOP and CaddellYates to submit a claim for payment to the U.S. Government. In performing its IGE analysis, Jacobs was obligated to comply with all applicable provisions of the FAR.

17. One of McCollum's principal employment tasks was to perform Jacobs' IGE analysis for the MPRs at the Aliceville Prison Project. The MPRs were typically submitted for analysis by Darrell Hainline ("Hainline"), the FBOP's on-site supervising construction representative. Hainline's duties included acting as the FBOP liaison between CaddellYates and Jacobs.

18. As noted above, the IGE analysis inherently requires the ability to compare the scope and details set forth in the existing Construction Documents, with the scope and details for the change orders itemized in a MPR. Stated another way, it is impossible to properly perform an IGE analysis without doing a side by side comparison of the MPR with the existing Contract Documents. However, it is equally important that the IGE analysis not be tainted by providing the independent analyst with the contractor's "new" price terms for the change orders.

19. Beginning on or about February or March 2009, Jacobs tasked McCollum to perform the IGE analysis for MPRs at the Aliceville Prison Project. At that time, Jacobs' Aliceville office did not have the existing Construction Documents necessary for comparative analysis. McCollum explained to his immediate Jacobs' supervisor, Jeff Adamo ("Adamo"), and to Hainline with the FBOP, that he couldn't perform the technical analysis necessary to validate or certify an IGE without

the necessary comparative documents. Hainline, however, gave the CaddellYates pricing terms to Adamo and McCollum, and instructed them to "fill up a folder" with paper [to give the illusion of a valid analysis] and to establish the IGE price in an amount which was consistent with CaddellYates' prices. Hainline made these and similar demands on multiple occasions prior to McCollum receiving a complete set of the Construction Document necessary to perform a valid IGE analysis.

20. On or about June 2009, McCollum finally received a complete set of Construction Documents. McCollum's analysis, however, lead him to conclude that CaddellYates pricing for the proposed change orders was falsified and/or grossly inflated. McCollum so informed Adamo and Hainline. Nevertheless, McCollum and Adamo were instructed by Hainline that their "independent" IGE price must closely match, to within a few percentage points, CaddellYates' price terms for each change order. Hainline made such demands because without Jacobs' approval/certification of the IGE, Hainline could not get the change orders approved and submitted for payment by the U.S. Government without further scrutiny.

21. During the periods of time described above, McCollum refused to sign or otherwise certify the validity of the IGEs because he reasonably believed that the CaddellYates' prices were developed with false pretenses and/or grossly inflated. With such knowledge, Adamo did, in fact, certify several IGEs, thereby knowingly conspire with Hainline and CaddellYates in the submission of false claims for payment by the United States Government.

22. On or about July 8, 2009, McCollum received an annual performance evaluation. McCollum received an excellent assessment, which was denoted as an overall 3.8 average on a scale of 1 to 5, with 5 being the highest possible rating.

23. Thereafter, Hainline continued to provide CaddellYates price terms to Jacobs, and persisted in his demands that Jacobs validate and certify IGEs in amounts that McCollum and Adamo knew to be false and/or grossly inflated by CaddellYates. McCollum continued his refusal to approve/certify the IGEs, because he reasonably believed that the same constituted fraud and a knowing violation of federal procurement law, as well as a breach of Jacobs' Policy Concerning Business Conduct, Integrity, and Ethics. (See Exhibit "2.") Adamo, however, continued to execute and certify the IGEs with full knowledge that the same were false and/or grossly inflated, thereby continuing the conspiracy to submit false claims for payment to the U.S. Government.

24. One specific example is as follows. On or about mid to late August 2009, Hainline, Adamo, and McCollum met to discuss a particular MPR. McCollum expressed that he could not possibly prepare an analysis that validated the CaddellYates pricing. On this occasion, Adamo initially stated that he was not willing to certify the IGE in the CaddellYates price range. Hainline became furious. Hainline wrote a dollar amount on a piece of paper and laid it on the table. Hainline said the meeting was to be reconvened the following day, at which time Hainline demanded that Jacobs provide him with an IGE certifying the dollar amount on the piece of paper. Adamo acquiesced.

25. A few days later, in the final week of August 2009, there was a "partnering session" between the FBOP management (including Hainline) and Jacobs' management (including a supervising field manager, Bob Paul (hereafter "Paul")), whereat McCollum was a topic of discussion. The following day Paul informed McCollum that Hainline was upset with McCollum's "speed" in processing change orders. A discussion was had between Paul and McCollum to the effect that the real issue was McCollum's lack of acquiescence and cooperation in validating the

change order IGEs in the amounts that Hainline demanded. Paul instructed McCollum to give Hainline what he wanted, otherwise there could be trouble. At the same time, Paul stated he understood the difficulty imposed on McCollum for being placed in such a situation. Paul suggested that perhaps McCollum should post for a similar assignment on another Jacobs' project to get him away from Hainline. Over the course of the next month McCollum searched for other intra-company assignments to no avail.

26. On September 23, 2009, McCollum to go over Adamo's and Paul's authority, and to report the fraudulent conduct and violation of Jacobs' own policies to off-site senior management. McCollum notified Greg Hartman (hereafter "Hartman") about the coercion from Hainline, as well as the conspiracy being perpetrated by Jacobs' on-site management to certify false prices on federal contract change orders. McCollum told Jacobs' management that he feared losing his job because of his refusal to cooperate in what McCollum reasonably believed to constitute a fraudulent scheme in violation of federal law and regulations. McCollum advised that he was looking for other positions within Jacobs as a means of extricating himself from the circumstances in which he had been placed through no fault of his own. McCollum offered to provide names and documents to prove this conspiracy, but Hartman failed to investigate further. McCollum received no response from Hartman or other Jacobs' management.

27. Two weeks later, on October 8, 2009, McCollum sent a second notification to Jacobs' off-site management, this time to Ms. Rhonda Reeves-Long (hereafter "Long"), once again detailing the coercion and conspiracy by Hainline and Jacobs' on-site management (Adamo and Paul) to violate federal procurement law by certifying and approving false and inflated construction costs, which would then be used to procure payment from the U.S. Government.

28. Following the second written notice to Jacobs, McCollum was contacted by Brian Scher, Jacobs' in-house legal counsel, (hereafter "Scher"), and Greg Saul, Jacobs' national estimating director (hereafter "Saul"). McCollum was interviewed by and briefed Scher and Saul on the events described above. McCollum requested their assistance in investigating said conspiracy, and offered his help in providing names of witnesses and the documents necessary to prove the violations of federal procurement regulations. Unfortunately, McCollum never heard back from Scher or Saul, nor was he informed as to the results of their investigation, if any.

29. Instead, a few days later, on or about October 19, 2009, Adamo informed McCollum that he was being placed on temporary leave of absence due to Hainline's demand that McCollum be replaced. Hainline had demanded that Jacobs fill McCollum's position with someone who would follow Hainline's orders and cooperate in the conspiracy described above.

30. McCollum's leave of absence was made effective immediately, *i.e.* October 19, 2009, but with an estimated return to work date scheduled for December 19, 2009, at which point it was anticipated that McCollum would be transferred to a different working assignment.

31. Jacobs did not find a new position for McCollum. Instead, by Jacobs' letter dated January 22, 2010, McCollum was informed that his employment had been terminated, retroactively effective as of December 20, 2009.

32. On or prior to July 7, 2010, McCollum filed a federal *qui tam* complaint under seal and served the same on the United States Attorney. The complaint alleged that Jacobs and others had conspired to certify, approve, and submit falsified change orders for payment by the United States Government in violation of the False Claims Act. Said complaint also contained a cause of action for retaliatory discharge pursuant to 31 U.S.C. §3130(h). On or about May 11, 2011, the *qui*

9

*tam* complaint was dismissed without prejudice. Thereafter, on or about September 12, 2011, certain portions of the *qui tam* pleadings were unsealed.

### III. Causes of Action

### Count I
### Retaliatory Discharge Pursuant to 31 U.S.C. §3130(h)

33. McCollum restates the allegations set forth in paragraphs 1 - 32 above and incorporates the same herein by reference.

34. McCollum's actions as alleged above evidence that he engaged in conduct protected by the False Claims Act and that Jacobs terminated his employment as a direct result of such protected conduct. More specifically, McCollum notified Jacobs' senior management and in-house legal counsel that Jacobs' personnel in Aliceville, Alabama were knowingly acquiescing and conspiring with Hainline to intentionally violate federal procurement law (the FAR) by means of knowingly certifying false and inflated prices on IGEs, which were then used to obtain payment from the U.S. Government on false pretenses and in violation of federal regulations. Additionally, McCollum specifically requested Jacobs' management and in-house counsel to investigate the same by interviewing witnesses and reviewing documents that McCollum agreed to identify and/or provide to Jacobs' investigators. Instead of investigating and exposing the fraudulent conduct, Jacobs chose instead to terminate McCollum's employment.

35. McCollum's termination was in retaliation for his notification and request for investigation into said fraudulent and illegal activity. More specifically, McCollum was removed from his position with Jacobs' Aliceville office within a matter of days after he reported the conspiracy and fraudulent conduct to Scher and Saul. In fact, McCollum was specifically informed

by Adamo that the reason for his removal was due to McCollum's failure to cooperate with Hainline's demands to validate and certify IGEs using CaddellYates false and/or inflated prices on change orders. Adamo and other Jacobs management knew that McCollum reasonably believed such activity to be fraudulent, illegal, and in blatant violation of federal procurement law, as well as Jacobs' own business conduct and ethics policies, yet Jacobs terminated McCollum anyway.

36. Despite being told that he would be reassigned to a new position, McCollum's employment with Jacobs was formally terminated as of January 22, 2010, which Jacobs unilaterally made retroactive to December 19, 2009.

37. Jacobs knew, or should have known, that the facts and circumstances reported by McCollum, coupled with McCollum's request for an investigation, would reasonably lead to the filing of an FCA claim or suit. Jacobs chose to stifle the same by removing McCollum from access to documents, and thereafter by terminating his employment.

38. McCollum seeks legal remedies and relief for injuries and damages which were directly and proximately caused by Jacobs retaliatory termination. More specifically, McCollum seeks the following relief pursuant to 31 U.S.C. §3730(h)(2):

(i) Reinstatement of employment to the same seniority status that McCollum would have had but for such retaliatory discharge;

(ii) Two times the amount of pay that McCollum would have received from October 19, 2009 through the date of his reinstatement. As of December 19, 2011, said amount totals the sum of $452,400.00;

(iii) Interest on the back pay award. As of December 19, 2011, said amount totals the sum of approximately $15,700.00;

11

(iv) Compensation for McCollum's emotional pain, suffering, and mental anguish; in a sum of not less than $1 million; and

(v) Litigation costs and expenses, including reasonable attorneys' fees in bringing this action.

## Count II
### Wrongful Discharge Under State Law

39. McCollum restates the allegations set forth in paragraphs 1 - 38 above and incorporates the same herein by reference.

40. In addition to his cause of action brought pursuant to the False Claims Act, McCollum invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. §1367 in order to pursue remedies under state law.

41. At all relevant times McCollum's employment with Jacobs was physically situated in Aliceville, Alabama. Accordingly, causes of action and remedies for wrongful discharge are premised on Alabama state law.

42. As consideration for his employment, Jacobs required McCollum to agree in writing to the terms and conditions of Jacobs Policy Concerning Business Conduct, Integrity, and Ethics. (See Exhibit "2" attached hereto and incorporated by reference, and hereafter referred to as the "Policy"). In this regard, key contractual terms and conditions of McCollum's employment with Jacobs included, but are not limited to, the following mutual obligations:

1. This Policy is intended to focus our employees on areas of business conduct, ethical risk, provide guidance to help them recognize and deal with ethical issues, provide mechanisms to report unethical conduct, foster a culture of honesty and accountability, deter wrongdoing, and promote accurate disclosure and reporting. (Exhibit 2, Page 2.)

2. Employees are encouraged to bring questions about particular circumstances that may involve one or more of the provisions of this Policy to the attention of Senior Management or the General Counsel. (Exhibit 2, Page 2.)

3. Unethical actions, or the appearance of unethical actions, are not acceptable. (Exhibit 2, Page 2.)

4. All employees are expected to comply with all laws, rules and regulations of all U.S. and non-U.S. governmental entities.... (Exhibit 2, Page 2.)

5. <u>We encourage employees to talk to supervisors, managers and other appropriate personnel when in doubt about the best course of action in a particular situation and to report violations of laws, rules and regulations to appropriate personnel or through the Integrity Hot Line. The Company does not tolerate retaliation for reports made in good faith</u>. (Exhibit 2, Page 2.)

6. Failure to comply with this Policy is cause for severe disciplinary action. (Exhibit 2, Page 2.)

7. While we must compete vigorously to **maximize profits**, we must at the same time do so in strict compliance with all laws and regulations applicable to our activities. No employee should at any time take any action on behalf of the Company which violates any applicable law or regulation. (Exhibit 2, Page 4.)

8. The Company respects the integrity of the procurement process. It is our policy to comply with both the law and the rules imposed by our clients in this regard.... If at any time, you have a concern that an action would compromise either our policy or that of the client, you should contact Senior Management or the General Counsel before proceeding. (Exhibit 2, Page 10.)

9. Good business ethics, quality products, and integrity in meeting commitments are appropriate to both our government and commercial businesses. However, suppliers of services to government clients have additional requirements not usually found in standard commercial transactions. (Exhibit 2, Page 11.)

10. The Federal government has adopted broad and detailed sets of regulations governing standards of conduct for contractors. These regulations serve as a model for public clients most of whom have either adopted the Federal standards, follow them as a matter of practice, or follow them because their projects are federally funded.... Because of the extent and complexity of procurement regulations, employees need to ensure that they understand the requirements governing the company and their individual conduct. It is the Company's policy to comply with all applicable laws, regulations and contract provisions. (Exhibit 2, Page 11.)

11. Employees involved, directly or indirectly, in preparing price proposals for any public client must take adequate precaution to ensure that when disclosure is required, costs are current, accurate, and complete, are properly disclosed, and records are retained for an appropriate time. (Exhibit 2, Page 11.)

12. REPORTING AND RESOLVING SUSPECTED IRREGULARITIES

Supervisors must see that employees who report to them receive adequate training about applicable Government and Company requirements. <u>Employees must obtain guidance concerning the propriety of any course of conduct about which they have any doubts.</u>

<u>Employees are required to report</u> the following matters to the General Counsel:

    6. <u>Incorrect or defective cost or pricing data on public sector projects</u>.

    11. <u>Any suspected violation of procurement laws or any Company policy</u>. (Exhibit 2, Page2 16-17.)

13. All employees have a moral; and in some cases, a legal obligation to call the Company's attention to any situation in which any Company policy may not be observed. <u>No discipline or other retaliatory action shall be taken against any employee informing the Company of any violations of any Company policy</u>. (Exhibit 2, Page 17.)

43. McCollum complied with the Policy by reporting his good faith concerns to Jacobs management as described above. Jacobs was then contractually obligated to refrain from retaliatory action against McCollum because of such reporting. Jacobs termination as described above constitutes retaliatory discharge in breach of Jacobs own contractual Policy.

44. Further, it constitutes wrongful termination against the public policy of the State of Alabama for an employer to terminate an employee simply because he acts in good faith as a "whistle blower" to report the employer's conspiracy to submit false claims to the government in violation of state or federal law. In this case, McCollum was terminated because he reported conduct which McCollum reasonably believed to violate the law, as well as Jacobs' own Policy.

45. Accordingly, pursuant to Alabama state law, McCollum is entitled to compensatory damages as a result of Jacobs' retaliatory discharge and wrongful termination. In this regard, McCollum is entitled to compensatory damages for back pay, front pay, and for pain, suffering and mental anguish, and for his costs and attorney fees as allowed by law.

46. McCollum is also entitled to an award of punitive damages against Jacobs in a sum of not less than $1 million as a result of Jacobs willful and wanton actions in terminating McCollum's employment for the intentional and deliberate purpose of concealing Jacobs own conspiracy to defraud the United States Government as described above. Jacobs actions were motivated by profit and greed inasmuch as it desired to appease its client–even to the extent of conspiring to violate the law–for financial gain and reward in future FBOP contract awards. Sadly, Jacobs chose to "play ball" with the FBOP instead of fulfilling the "checks and balances" role as otherwise required by its contract, federal law, and its own Policy on ethical conduct. Jacobs should be punished for its actions to deter it from such conduct in the future, and to deter others from engaging in similar conduct.

### *IV. Request for Jury Trial*

47. McCollum restates the allegations set forth in paragraphs 1 - 46 above and incorporates the same herein by reference.

48. The Plaintiff hereby respectfully demands a trial by jury.

## V. *Prayer for Relief*

WHEREFORE, the Plaintiff, Scotty McCollum, hereby prays that he have and recover a judgment against the Defendant, Jacobs Engineering Group, Inc., for retaliatory discrimination and discharge pursuant to the False Claims Act as codified above; and for wrongful discharge of employment pursuant to Alabama state law; and that he be awarded a judgment for statutory damages as proven at trial pursuant to 31 U.S.C. §3730(h)(2); and for such additional compensatory and punitive damages to which McCollum may be entitled pursuant to Alabama state law; and for his costs, litigation expenses, and attorney fees, as allowed by law; as well as for all other appropriate relief for which McCollum may prove himself entitled.

Respectfully submitted,

SCOTTY McCOLLUM, Plaintiff

By: Timothy L. Brooks, Arkansas Bar ID #89187
(*Pro Hac Vice* Application Pending)
Taylor Law Partners LLP
303 E. Millsap Road
P.O. Box 8310
Fayetteville, Arkansas 72703
Telephone: (479) 443-5222
Facsimile: (479) 443-7842
E-mail: tbrooks@taylorlawpartners.com

and

Brad Pigott
Mississippi Bar No. 4350
Pigott & Johnson
P.O. Box 22725
Jackson, Mississippi 39225-2725
Telephone: (601) 354-2121
Facsimile: (601) 354-7854
E-Mail: bpigott@pjlawyers.com