IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

SCOTTY MCCOLLUM                                          PLAINTIFF

VS.                        CIVIL ACTION NO. 3:13-cv-866(DCB)(MTP)

JACOBS ENGINEERING GROUP, INC.,
and JACOBS PROJECT MANAGEMENT CO.                       DEFENDANTS

<u>MEMORANDUM OPINION AND ORDER</u>

This cause is before the Court on the defendants Jacobs Engineering Group, Inc., and Jacobs Project Management Co.'s Motion for Summary Judgment **(docket entry 57)**. The Court has carefully considered the motion and response, as well as the memoranda of the parties, all supporting documents, and the applicable law. The Court held a hearing on the motion on December 10, 2013, and received supplemental briefing from the parties. Being fully advised in the premises, the Court finds as follows:

In 2008, the Federal Bureau of Prisons ("BOP") awarded Caddell-Yates a contract to design and build a federal correctional institution for women in Aliceville, Alabama. Jacobs Project Management Co. ("Jacobs") was awarded a separate contract to perform construction management services for the BOP on the Aliceville Project.

As construction manager, Jacobs provided advice and assistance to the BOP in managing the construction of the prison by Caddell-Yates. In October of 2008, Jacobs hired Scotty McCollum ("McCollum") as a resident field engineer for the Aliceville

Project.

One of McCollum's responsibilities was to prepare independent government estimates ("IGEs") for the BOP. Among other things, the BOP used IGEs to negotiate the pricing of change orders with Caddell-Yates. As is customary, Jacobs hired McCollum for a single project – the Aliceville Project – and his employment was to conclude at the end of that project. See Exhibit 5 to Defendants' Motion for Summary Judgment,[1] 42:2-43:4 (Reeves-Long). McCollum's employment was expected to conclude on August 5, 2011, when the Aliceville Project was scheduled to be completed. Def. Ex. 6, at 1.

Beginning in February of 2009, the BOP's on-site supervisor, Darell Hainline, made a series of complaints to Jeff Adamo, McCollum's direct supervisor, about the timeliness with which McCollum was preparing estimates. Def. Ex. 7, 77:10-17 (Adamo). Hainline made similar complaints to Bob Paul, Adamo's supervisor. Def. Ex. 8, 70:7-72:22 (Paul). Hainline felt that McCollum was taking too long to prepare IGEs, and that the IGEs he ultimately did prepare contained obvious errors and omissions. Def. Ex. 9, 41:1-24, 42:0-43:17 (Hainline).

Hainline was also critical of McCollum's work ethic. He complained to Adamo, Paul, and others that McCollum would arrive to

---

[1] Hereafter, exhibits to the defendants' motion for summary judgment are referred to as "Def. Ex."

work late, and take lunches well beyond the allotted thirty minutes. Def. Ex. 7, 77:14-21 (Adamo); Def. Ex. 9, 31:19-33:17, 49:7-23, 182:5-12, 205:7-206:3 (Hainline).

Paul and Adamo spoke with McCollum on a number of occasions about these complaints. They offered McCollum constructive criticism and encouraged him to improve his performance. Def. Ex. 10, at 1; Def. Ex. 4, at 2.

McCollum disagreed with Hainline's assessment of his performance, and felt that Hainline's approach to processing change orders was misguided. He insisted that his IGEs were only delayed because he did not have the documents necessary to do his job. Def. Ex. 11, at 4-5; Def. Ex. 10, at 1.

In July of 2009, Adamo conducted McCollum's annual performance review. Adamo was generally positive about McCollum's performance, and principally was concerned with repairing his poor relationship with Hainline. Def. Ex. 2, 132:23-134:24 (McCollum).

McCollum's relationship with BOP's Hainline did not improve. In August and September of 2009, Hainline reiterated to Paul and Adamo that McCollum's performance and work ethic were unacceptable. Def. Ex. 7, 104:3-16 (Adamo); Def. Ex. 8, 171:6-172:5 (Paul). Hainline explained that McCollum's habit of arriving late and taking long lunches was getting worse, not better. Def. Ex. 9, 30:7-33:17, 34:11-36:3, 37:23-38:5 (Hainline).

Hainline had started keeping track of the times that McCollum

arrived in the morning, took lunch, and left in the afternoon. Id., 30:7-31:18. Hainline felt that McCollum's attendance was "completely unacceptable." Id., 30:15-19. Hainline notified Jacobs that the BOP wanted Jacobs to replace McCollum on the Aliceville Project. Id., at 178:3-19; Def. Ex. 10, at 2.

Paul and Adamo informed McCollum of the BOP's decision. Def. Ex. 8, 202:15-203:4 (Paul); Def. Ex. 10, at 2-3. They offered to provide good references, and Paul agreed to keep McCollum in mind for positions that might become available in the future. Def. Ex. 2, 140:14-141:8, 145:20-22 (McCollum); Def. Ex. 8, 179:4-12, 193:19-194:6 (Paul).

Paul also contacted Jacobs' managers in Arlington and Orlando on McCollum's behalf to try to find him another position. Def. Ex. 8, 183:7-20 (Paul). Meanwhile, McCollum demanded to see the BOP's complaints about his performance in writing. Def. Ex. 2, 163:13-22 (McCollum).

On October 6, 2009, John Hume – a contracting officer with the BOP – sent a letter to Jacobs formally directing that McCollum be replaced "as soon as practicable." Def. Ex. 1, at 2. The letter stated that McCollum's estimates were "not being completed in a timely fashion," and were "not thorough" or "sufficiently credible to allow the BOP to adequately evaluate or negotiate proposals from the Design Builder with confidence." Id. at 1.

The October 6th letter noted that under paragraph E.6 of the

4

agreement between Jacobs and the BOP, the BOP "reserves the right to require a change or replacement of [Jacobs] personnel."  The BOP's letter then concluded:

> This letter is to notify Jacobs Technology that the current Estimator [McCollum] is not satisfactorily performing the duties required by our contract. It is in the best interests of the Government to replace the CMF[2] staff member ... Please propose a suitable replacement/ substitution as soon as practicable.

Id. at 1-2.

Meanwhile, McCollum had begun complaining about the IGE process on the Aliceville Project. Def. Ex. 8, 173:7-13, 202:15-203:8 (Paul); Def. Ex. 10, at 2-3.  In late September, McCollum e-mailed Greg Hartman, a Jacobs' recruiter, complaining about potentially losing his position "on false pretenses." Def. Ex. 14. Then, only days after the BOP sent its letter, McCollum made similar complaints to Rhonda Reeves-Long ("Reeves-Long") in Jacobs' Human Resources Department.  Def. Ex. 15; Ex. 16.

Because Jacobs was contractually obligated to honor the BOP's demand that McCollum be removed from the Project, Jacobs began interviewing for McCollum's replacement.  Def. Ex. 3, at § E.6; Def. Ex. 17, 22:6-23:3, 27:16-29:9 (Hume); Def. Ex. 10, at 2-3.  On October 14, 2009, the BOP approved Roy Steege as McCollum's replacement on the Aliceville Project.  Def. Ex. 19.

On October 19, 2009, Jacobs removed McCollum from the

---

[2] "Construction Management Firm," i.e. Jacobs Project Management Co.  See Def. Ex. 3 ("Statement of Work"), ¶ A.1.

Aliceville Project and, consistent with company policy, placed him on Company Convenience Leave ("CCL"), an unpaid leave of absence, for sixty days.  Def. Ex. 20; Def. Ex. 21.  McCollum was informed that CCL was for those "who are temporarily without billable work," and that Jacobs "cannot guarantee reinstatement."  Def. Ex. 20.  Pursuant to Jacobs' policy, "[i]f [an] employee cannot be returned to active status upon the end of the Company Convenience Leave," then his "employment will be terminated."  Def. Ex. 21.

McCollum does not recall applying for another position with Jacobs.  Def. Ex. 2, at 156:5-157:20 (McCollum).  He informally contacted several project managers, but none was aware of an open position at that time.  Id., at 157:21-158:19, 172:8-22.; Compl. ¶ 26.  These Jacobs managers confirmed that "things [we]re slow," and they actually had some "soft spots with several other personnel," given the scarcity of work.  Def. Ex. 22; Def. Ex. 23.

McCollum's CCL period expired on December 19, 2009.  Pursuant to company policy, because he failed to obtain another billable position, McCollum was laid off effective December 20, 2009.  Def. Ex. 24.  In March of 2010, McCollum was hired by the U.S. Army Corps of Engineers, where he remains employed today.  Def. Ex. 2, 23:15-26:11 (McCollum).

On July 7, 2010, McCollum filed a federal qui tam complaint under seal and served the same on the United States Attorney.  The complaint alleged that Jacobs and others had conspired to certify,

approve and submit falsified change orders for payment by the United States Government in violation of the False Claims Act. The complaint also contained a claim for retaliatory discharge pursuant to 31 U.S.C. § 3130(h).

The False Claims Act ("FCA") may be enforced by the Attorney General, or by a private person, known as a "relator," who brings a qui tam suit "for the person and for the United States Government ... in the name of the Government." 31 U.S.C. § 3730(a)&(b). A qui tam suit is filed in camera and remains under seal for sixty days. 31 U.S.C. § 3730(b)(2). The relator must present all material evidence to the Government. During the sixty days, the Government may intervene and proceed with the action itself. Id. If the Government declines to intervene, the relator may proceed on his own. 31 U.S.C. § 3730(b)(4)(B).

The qui tam relator is also protected by the FCA's "whistleblower" provision, which provides relief to any employee who suffers retaliation for bringing a claim under the FCA or assisting an employee-relator who does so. 31 U.S.C. § 3730(h). The whistleblower protection extends to any relator who brings a claim in good faith, whether or not the claim is successful. See 31 U.S.C. § 3730(h)(1)("Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any

other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.").

In this case, the Government declined to intervene in McCollum's qui tam action, and McCollum chose not to proceed on his own. The Government's decision not to intervene does not necessarily indicate that its decision was made because the relator's case had no merit. The Government may choose not to intervene for any number of reasons. Likewise, a plaintiff's decision not to proceed may be for reasons other than lack of merit. See Thompson v. Quorum Health Resources, LLC, 2010 WL 1904330, *5 (W.D. Ky. May 11, 2010).

On December 19, 2011, McCollum filed his Complaint against Jacobs Engineering Group, Inc., and Jacobs Project Management Co. On December 18, 2012, he filed his First Amended Complaint. The plaintiff asserts, in Count I, a claim for retaliatory discharge pursuant to 31 U.S.C. § 3730(h), and, in Count II, a claim for wrongful discharge under Alabama state law.

The defendants move for summary judgment. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A fact is 'material' if

8

its resolution in favor of one party might affect the outcome of the lawsuit under governing law.  An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party." Ginsberg 1985 Real Estate P'ship v. Cadle Co., 39 F.3d 528, 531 (5th Cir. 1994)(citations omitted).  The party moving for summary judgment bears the initial responsibility of apprising the district court of the basis for its motion and the parts of the record which indicate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

"Once the moving party presents the district court with a properly supported summary judgment motion, the burden shifts to the non-moving party to show that summary judgment is inappropriate." Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). But the nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Moreover, "[t]he mere existence of a scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 252.  Summary judgment must be rendered when the nonvovant "fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

Several federal courts of appeals have held that, in the absence of direct evidence of retaliation, the burden-shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), should be applied to FCA retaliation claims, as it is applied to most federal statutes governing employment discrimination and retaliation claims. See Guerrero v. Total Renal Care, Inc., 932 F.Supp.2d 769, 785 (W.D. Tex. 2013), and cases cited therein. Although the Fifth Circuit has not addressed this question, several district courts in the Fifth Circuit have applied the McDonnell Douglas framework. See id., and cases cited therein. The parties in this action, as well as the Court, have already assumed that McDonnell Douglas applies. See McCollum v. Jacobs Engineering Group, Inc., 2012 WL 3811750, *3 n.1 (S.D. Miss. Sept. 4, 2012).

McCollum does not present any direct evidence of retaliation. To establish a prima facie case under 31 U.S.C. § 3730(h), he must show (1) that he was engaged in protected activity with respect to the FCA; (2) that his employer knew he was engaged in protected activity; and (3) that he was discharged because he was engaged in protected activity. Thomas v. ITT Educational Serv's., Inc., 517 Fed.Appx. 259, 262 (5th Cir. 2013)(citing Robertson v. Bell

10

Helicopter Textron, Inc., 32 F.3d 948, 951 (5th Cir. 1994)). The
plaintiff's burden is not great: he "merely needs to establish
facts adequate to permit an inference of retaliatory motive."
Forman v. Small, 271 F.3d 285, 299 (D.C. Cir. 2001).

If the employer successfully presents a legitimate, non-
retaliatory reason for its actions, "the presumption raised by the
prima facie case is rebutted and drops from the case." St. Mary's
Honor Center v. Hicks, 509 U.S. 502, 507 (1993)(internal citation
omitted); see also Brady v. Office of Sergeant at Arms, 520 F.3d
490, 494 (D.C. Cir. 2008)(noting that "the prima facie case is a
largely unnecessary sideshow"). Upon such a showing by the
employer, the district court need only resolve one question: Has
the employee produced sufficient evidence for a reasonable jury to
find that the employer's asserted non-retaliatory reason was not
the actual reason and that the employer intentionally retaliated
against the employee because of the employee's engaging in
protected activity? See Brady, 520 F.3d at 494 (posing similar
question in the context of a Title VII disparate treatment case).
In other words, to show pretext the employee must show both that
the reason was false, and that retaliation was the real reason.
See Weber v. Battista, 494 F.3d 179, 186 (D.C. Cir. 2007). See
also St. Mary's, 509 U.S. at 515 ("[A] reason cannot be proved to
be 'a pretext for discrimination' unless it is shown both that the
reason was false, and that discrimination was the real reason.").

11

"A protected activity is one motivated by a concern regarding fraud against the government." Thomas, 517 Fed.Appx. at 262 (citing Riddle v. Dyncorp Int'l, Inc., 666 F.3d 940, 941 (5th Cir. 2012)). "The Fifth Circuit recognizes internal complaints that 'concern false or fraudulent claims for payment submitted to the government' as protected activity under the Act, but requires that the complaints raise concerns about fraud." George v. Boston Scientific Corp., 864 F.Supp.2d 597, 605 (S.D. Tex. 2012)(citing Patton v. Shaw Serv's., L.L.C., 418 Fed.Appx. 366, 372 (5th Cir. 2011); and Robertson, 32 F.3d at 952)). Moreover, in Robertson, the Fifth Circuit held that an employee, whose job description included substantiating costs his employer was charging the government, must do more than merely question his supervisors about noncompliance. Robertson, 32 F.3d at 951-52. In Robertson, the plaintiff "gave no suggestion that she was going to report such noncompliance to government officials." Id. at 1523.

Jacobs points out that McCollum's job duties included substantiating costs that would potentially be charged to the government. It also notes that because McCollum was responsible for "contract compliance," he had a heightened burden to prove that he placed Jacobs on notice that "litigation was a reasonable possibility." Jacobs' Brief, p. 11 n.7 (quoting United States ex rel. Schweizer v. Océ N.V., 677 F.3d 1228, 1240-41 (D.C. Cir. 2012)). Jacobs contends that McCollum did not engage in any

protected activity. In the alternative, it argues that even if McCollum did engage in protected activity, he did not make a complaint to anyone beyond his direct supervisors until after the BOP ordered his removal; thus, he did not provide Jacobs with notice of any protected activity. Id., citing United States ex rel. Scott v. Metropolitan Health Corp., 375 F.Supp.2d 626, 644 (W.D. Mich. 2005)(where whistleblower is charged with "compliance responsibilities," the employer "must receive heightened notice that employee intended to further a qui tam/FCA action rather than merely warning the defendant of the consequences of its conduct"). The Court finds that even if McCollum did engage in protected activity, he did not provide sufficient notice to his employer, and therefore he cannot show that he was discharged because of any protected activity. Alternatively, even if he could meet the first two elements of a prima facie case, he has not provided sufficient evidence to permit an inference of a retaliatory motive.

In addition, the Court assumes, arguendo, that the plaintiff can make a prima facie case, and proceeds to the next phase of the McDonnell Douglas analysis. The Court finds that Jacobs has submitted a body of evidence indicating grounds for termination wholly independent of any alleged protected activity of the plaintiff. Jacobs' legitimate non-retaliatory reason for termination is two-fold: (1) the contract between the BOP and Jacobs provided that the BOP could, at any time and at its sole

discretion, require the removal of any Jacobs employee working on the Aliceville Project; and (2) no other position was available for McCollum during the time he was on CCL.

The "Statement of Work," which is the contract between the BOP and Jacobs, provides in Section E ("Basic Services"):

> The BOP reserves the right to require a change or replacement of CMF[3] personnel if, in the judgment of both the PM[4] and PCO-CMF[5], the staff member fails to satisfactorily perform his/her duties and/or otherwise demonstrates it is in the best interests of the Government to replace the CMF staff member.

Def. Ex. 3 ("Statement of Work"), ¶ E.6.  Therefore, removal of a Jacobs employee from the Project is solely at the discretion of the BOP, with no input from Jacobs.

As for the second part of its non-retaliatory reason, Jacobs provides evidence that shows McCollum was placed on CCL in keeping with company policy, and that Jacobs tried to find him a position during the 60-day period, but no work was available.  Def. Ex. 20; Def. Ex. 5, 102:18-103:2 (Reeves-Long); Def. Ex. 2, 202:11-17, 206:2-6, 210:25-211:11 (McCollum); Def. Ex. 8, 183:12-20 (Paul); Def. Ex. 22; Def. Ex. 23; Def. Ex. 26.  McCollum's employment with

---

[3] See footnote 2.

[4] "Project Manager": "A BOP employee located in the Central Office assigned the overall responsibility for and authority over the project for which services under this Contract are to be provided."  Def. Ex. 3 ("Statement of Work"), ¶ C.5.e.

[5] "Project Contracting Officer": "The employee of the BOP designated as the Contracting Officer for this Contract."  Def. Ex. 3 ("Statement of Work"), ¶ C.5.a.

Jacobs was also terminated according to company policy, which provides: "[i]f [an] employee cannot be returned to active status upon the end of the Company Convenience Leave," then his "employment will be terminated." Def. Ex. 21. Furthermore, the evidence shows that Jacobs was considering hiring McCollum for another project as late as February of 2010 (after McCollum's CCL had expired), but McCollum took a job with the Army Corps of Engineers. Def. Ex. 26; Def. Ex. 2, 23:15-26:11 (McCollum).

The Fifth Circuit Court of Appeals addressed a similar scenario in Okoye v. Univ. of Texas Houston Health Science Cntr., 245 F.3d 507 (5th Cir. 2001), a Title VII discrimination case. The plaintiff ("Okoye") was employed by a Health Center ("the Center") which had a contract with a County Sheriff's Department to provide medical personnel for detention facilities. Section 6(c) of the contract provided that the Sheriff had the ultimate decision-making authority regarding who was allowed access to the detention facilities. Id. at 510. The Sheriff's Department invoked its right to bar Okoye from the jail. After unsuccessfully searching for another position for the plaintiff, the Center informed her that her employment was terminated.

The plaintiff sued her employer, alleging race discrimination under Title VII, and claiming that the Center discriminated against her by accepting the Sheriff's invocation of §6(c) and terminating her employment. Id. at 511. The plaintiff contended that the

15

Center knew or should have known that the Sheriff's Department was discriminating against her.  Id. at 512.

The district court granted summary judgment in favor of the Center, and the plaintiff appealed.  The Fifth Circuit affirmed, finding:

> [The Center] asserts that Okoye was removed from the jail assignment after the Sheriff invoked § 6(c) of the contract.  Section 6(c) did not afford [the Center] discretion to retain an employee at the jail whom the Sheriff had barred from the jail.  Furthermore, [the Center] claims that Okoye was not retained in another capacity at [the Center] because an alternative position was not available.  [The Center's] reason for not retaining Okoye was clear and specific – [the Center] was contractually obliged to defer to the Sheriff's invocation of § 6(c) – and, therefore, [the Center] has met its burden of production.

Id. at 513.

The Court of Appeals noted that Okoye was required to raise a genuine issue of material fact that the Center discriminated against her – either by providing direct evidence of discrimination, or "by proving that an issue of material fact exists through circumstantial evidence, i.e., by demonstrating that an issue exists that ["the Center's"] proffered reason is a pretext for discrimination."  Id.

Okoye was unable to provide any evidence that the reason provided by the Health Center was false.  She nevertheless contended that the Center was liable for discrimination because it was "complicit" in the Sheriff's allegedly discriminatory invocation of § 6(c).  The Fifth Circuit found, however, that the

16

plaintiff had failed to produce any evidence of complicity, had otherwise failed to raise an inference of discrimination, and had not met her burden to produce evidence that the Center's reliance on §6(c) was a pretext for discrimination.  Id. at 515.

In this case, Jacobs has articulated what is unquestionably a legitimate, non-retaliatory reason for the plaintiff's termination. See Stage v. PPG Industries, Inc., 2011 WL 2532219, *7 (E.D. Tenn. June 24, 2011)("An employee's inability to perform her job, because she has been banned from entering a third party's venue in which she was to perform her job, is a legitimate, non-retaliatory reason for termination.").

In order to show pretext, the plaintiff must show that (1) Jacobs' proffered reasons for adverse actions had no factual basis; (2) Jacobs' proffered reasons did not actually motivate Jacobs' actions; or (3) Jacobs' proffered reasons were insufficient to motivate the actions.  See id., citing Adair v. Charter Cnty. of Wayne, 452 F.3d 482, 489-91 (6th Cir. 2006).  McCollum has not meaningfully disputed the fact of Hainline's dissatisfaction with his job performance; nor does he argue that Hainline and the BOP did not demand his removal from the job.  The evidence submitted by Jacobs shows that Hainline's criticism of McCollum was a frequent subject of concern and discussion among Hainline, McCollum, and other Jacobs personnel.  The evidence further shows that Jacobs attempted to repair the relationship between Hainline and McCollum

17

prior to McCollum being removed by the BOP.  McCollum has not produced any evidence to indicate any complicity on Jacobs' part concerning any allegedly retaliatory action by Hainline and/or the BOP.

Nor has McCollum produced any evidence of a "conspiracy" to retaliate against him, to which he alludes on pages 32-33 of his brief.   The elements of a claim for civil conspiracy are essentially the same in Alabama and Mississippi.  See Peters v. Amoco Oil Co., 57 Supp.2d 1268, 1284 (M.D. Ala. 1999)(citing Haapanen v. Bogle, 643 So.2d 547, 551 (Ala. 1994), and Shaw v. Burchfield, 481 So.2d 247 (Miss. 1985)).  The elements of a civil conspiracy are: "(1) two or more persons or corporations; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result."  Gallagher Bassett Serv's., Inc. v. Jeffcoat, 887 So.2d 777, 786 (Miss. 2004).  McCollum fails to identify whom he alleges took part in the conspiracy; nor does he provide evidence of any meeting of the minds or any unlawful overt acts.   He has simply made highly conclusory and unsupported allegations of a conspiracy.  "There is no actionable conspiracy ... where all that is shown is the exercise in a lawful manner of a right to terminate a contract."  Shaw, 481 So.2d at 255.   In other words, there is no conspiracy if the underlying cause of action is not viable.  Allied Supply Co., Inc. v. Brown, , 585

So.2d 33, 36 (Ala. 1991).

Nor has McCollum produced any evidence to indicate that Jacobs' process in abiding by its contract with the BOP was a sham and that Jacobs was not actually motivated by its stated reasons. Similarly, McCollum has not produced any evidence to show that Jacobs did not make a good faith effort to find him another position with the company. There are no "smoking guns" suggesting that Jacobs terminated McCollum for retaliatory reasons. Nothing in the record suggests that Jacobs' proffered reasons did not actually motivate its actions. Finally, McCollum cannot show that Jacobs' proffered reasons, if true, were insufficient to justify his termination. Viewing the evidence in the light most favorable to the plaintiff, the Court finds that he cannot show that Jacobs' legitimate, non-retaliatory reasons are pretextual. The Court therefore finds that the plaintiff has failed to raise any genuine issues of material fact as to his FCA retaliatory discharge claim against Jacobs, and summary judgment in favor of Jacobs is proper.

As to Jacobs Engineering Group, Inc., uncontested evidence in the record shows that Jacobs Project Management Co. is a wholly-owned subsidiary of Jacobs Engineering Group, Inc., and that Jacobs Project Management, not Jacobs Engineering Group, was McCollum's employer. Since Jacobs Engineering Group was not the plaintiff's employer, it is entitled to summary judgment on that basis.

As for McCollum's wrongful discharge claim under Alabama state

19

law, "[t]he bedrock principle of Alabama employment law is that, in the absence of a contract providing otherwise, employment in this state is at-will, terminable at the will of either party." <u>Ex parte Amoco Fabrics & Fiber Co.</u>, 729 So.2d 336, 339 (Ala. 1998). In some cases, a "policy contained in an employee manual issued to an employee" can "become a binding promise once it is accepted by the employee." <u>Hoffman-La Roche, Inc. v. Campbell</u>, 512 So.2d 725, 733 (Ala. 1987). For such an implied contract to arise, first, "the language used in the handbook [or policy manual] must be specific enough to constitute an actual offer rather than a mere general statement of policy." <u>Id</u>. at 734 (citation omitted). "If the provision in the manual meets the contractual requirements for an offer, then [the Court] must determine whether the evidence indicates that the offer was communicated to the employee[ ] ...." <u>Ex parte Amoco Fabrics</u>, 729 So.2d at 339. If so, then the Court should "determine whether ... the employee[ ] accepted the offer by continuing [his] employment after becoming aware of the offer." <u>Id</u>.

McCollum asserts that Jacobs' Corporate Policy Concerning Business Conduct, Integrity, and Ethics ("the Policy") constituted an implied employment contract which Jacobs breached when it terminated him. The Policy was referenced in the Employee Acceptance Statement which Jacobs signed when he accepted his offer of employment with Jacobs. Compl. Ex. 1, p. 3 ("As a further

condition of your employment, on your first day of employment, you will be asked to ... read the Jacobs Corporate Policy concerning Business Conduct, and sign a Statement of Understanding and Compliance.  Copies of those documents are attached for your review.").  The Policy "is intended to serve as a source of guiding principles" and covers such topics as business conduct, antitrust compliance, the use of inside information, procurement integrity, and government investigations.  Compl. Ex. 2, § 1.0.  McCollum relies primarily upon the following provisions:

> We encourage employees to talk to supervisors, managers, and other appropriate personnel when in doubt about the best course of action in a particular situation and to report violations of laws, rules and regulations to appropriate personnel or through the Integrity Hot Line. The Company does not tolerate retaliation for reports made in good faith.
>
> Employees are required to report the following matters to the General Counsel:
>
> ...
>
> 6.  Incorrect or defective cost or pricing data on public sector projects.
>
> ...
>
> 11.  Any suspected violation of procurement laws or any Company policy ...
>
> ...
>
> All employees have a moral, and in some cases, a legal obligation to call the Company's attention to any situation in which any Company policy may not be observed.  No discipline or other retaliatory action shall be taken against any employee informing the Company of any violations of any Company policy.

Id., §§ 1.0, 14.0, 15.2.  This last provision is comparable to
language the Alabama Supreme Court has found sufficiently definite
to create an employment contract.  See, e.g., Ex parte Amoco
Fabrics, 729 So.2d at 337–38 ("Whenever it is necessary to reduce
the number of employees within a job classification the employee
within that classification with the least job seniority will be
reduced from that job."); Hoffman-La Roche, Inc., 512 So.2d at
736–37 (concluding that handbook language setting forth procedures
governing the "five types of termination" was "clear enough that an
employee reading it could reasonably believe that, as long as he
worked within the guidelines set out in the handbook, he would not
be terminated until all procedures set out in the handbook had been
followed, including the reasons and circumstances for termination
in the handbook").  The language is readily understood "as a
promise not to dismiss" in retaliation for whistleblowing.  Campisi
v. Scoles Cadillac, Inc., 611 So.2d 296, 299 (Ala. 1992).  It is
undisputed that the provisions were communicated to McCollum, who
accepted the offer by accepting and continuing his employment.  See
Ex parte Amoco Fabrics, 729 So. 2d at 339–40.

McCollum's claim for wrongful discharge fails, however, for
the same reason his FCA retaliation claim fails.  Even if he can be
said to have reported violations of laws, rules or regulations to
Jacobs, he has not shown that his employment was terminated in
retaliation for such reporting.  Therefore, Jacobs is entitled to

22

summary judgment on McCollum's state law claim for wrongful discharge.

Accordingly,

IT IS HEREBY ORDERED that the defendants Jacobs Engineering Group, Inc., and Jacobs Project Management Co.'s Motion for Summary Judgment **(docket entry 57)** is GRANTED as to the plaintiff's claim for retaliatory discharge pursuant to 31 U.S.C. § 3730(h), and as to the plaintiff's claim for wrongful discharge under Alabama state law. A final judgment dismissing the plaintiff's claims with prejudice shall follow.

SO ORDERED, this the 21st day of January, 2014.


/s/ David Bramlette
UNITED STATES DISTRICT JUDGE